JOHN TIGER, APPELLEE, V. BUTTON LAND COMPANY ET AL., APPELLANTS.

FILED MARCH 12, 1912.    No. 17,006.

Quieting Title: EVIDENCE: FRAUD. Evidence examined and partially set out in the opinion, held sufficient to sustain the findings and decree of the district court.

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. Affirmed.

Flansburg & Williams and Leonard A. Flansburg, for appellants.

E. J. Clements, contra.

FAWCETT, J.

From a decree of the district court for Lancaster county, canceling certain notes and a mortgage upon the northwest quarter of section 29, township 11, range 8, in Lancaster county, and ordering the execution of a deed by plaintiff to defendant H. E. Gibson for certain lands in Costilla county, Colorado, together with certain shares in two irrigation companies in that county, and canceling a deed to the land in Lancaster county, above described, executed by plaintiff to one H. Ross, and a deed to said lands executed by said Ross to defendant Free, and quieting plaintiff's title in and to said land, defendants appeal.

The brief of defendants contains three assignments of error, as the grounds upon which the appeal is based: (1) That the evidence is not sufficient to sustain the findings and decree. (2) That there was no actual fraud on the part of defendants and no damage to plaintiff, and that in any event plaintiff, by his acts and conduct after discovering the fraud and deception, waived his right to rescind. (3) That the settlement pleaded was in full force and effect, and that the court erred in not giving full faith and credit thereto.

The record shows that defendants A. L. and B. G. Button are brothers, and in 1908 were doing business under the name of "Button Land Co." Their stationery set forth that the company had a capital of $300,000; that A. L. Button was president and B. G. Button secretary and treasurer. In February, 1908, W. S. Tiger, a brother of plaintiff, who was then in the service of the Buttons as a soliciting agent, contracted with them for the purchase of 80 acres of land in the San Luis Valley, Colorado, for the sum of $2,800, upon which he paid $600 in cash, and agreed to apply certain of his salary on the purchase price of said land. While so employed he introduced plaintiff to his employers. The Buttons at that time were conducting excursions from Lincoln to the San Luis Valley.

Upon one of those excursions, which started from Lincoln about March 8, 1908, plaintiff, with a number of others, accompanied the Buttons on a trip through the valley named. Plaintiff testified that when they reached the valley the Buttons had conveyances ready in which they took the excursionists to Monte Vista, and showed them some irrigated farms near that place, telling them what immense crops were raised on the land shown, that the land was selling for $150 to $200 an acre, and that the land which they had to sell was just as good as that land. On the day following, the excursionists, including plaintiff, were taken by the Buttons and shown the lands which they wished to sell. These lands were in the vicinity of Mosca. On this trip plaintiff rode in a carriage with defendant A. L. Button. Much of the land shown had the appearance of having been improved and cultivated and then abandoned. Plaintiff asked Mr. Button the reason for this, and was informed by him that it was on account of the lands being in litigation, which resulted in the water being shut off and that the people had to move out, but that the litigation had been settled and many of them were returning again. Just before reaching a certain quarter section, Mr. Button told plaintiff that the place they were coming to was a bargain; that the owner, who lived in Iowa, had been holding it at $50 an acre, but had been speculating, was hard-up for money, "and had given them an option on it at $40 an acre cash; that the time was nearly up and they had to sell it pretty quick;" that he told plaintiff that this land was just as good as that he had shown them at Monte Vista; that two water rights went with it sufficient to irrigate the land, and that it was a great bargain at $40 an acre; that he told Mr. Button that he (plaintiff) knew nothing about that country or the land or of irrigated lands, and that if he bought he would have to depend on Mr. Button's judgment for he knew nothing about it; that Button told him he could do so "as they had investigated it and knew it was all right;" that he then told Button that he had no

money with which to buy land; that if he bought it he
would have to put a mortgage on his Lancaster county
farm; that Mr. Button said they would attend to that;
"that he could get the money for plaintiff any day;" that
plaintiff relied upon the statements and representations
made by Button and was thereby induced to and did agree
to purchase the quarter section at $40 an acre. Upon
their return to Nebraska, Button had a mortgage pre-
pared for $6,400 upon plaintiff's farm in Lancaster
county, which the undisputed evidence shows was then
worth $16,000, encumbered by a $1,500 mortgage. The
mortgage for $6,400 was executed by plaintiff and his
wife and delivered to Button. For this plaintiff was en-
titled to receive a deed to the quarter section of land in
Colorado, clear of all incumbrances. This mortgage was
executed to defendant J. W. Drown, as mortgagee.
Drown is the father-in-law of defendant B. G. Button.
After entering into the agreement for the purchase of
the quarter section of land in Colorado, and before the
execution of any deed therefor to plaintiff, defendants
Button undertook, as agents for plaintiff, to sell his equity
in the Lancaster county farm, which at that time, under
the undisputed evidence, was worth $8,100. For doing
this they were to receive a commission of $400. Shortly
after undertaking the sale of this equity, Button repre-
sented to plaintiff that he could obtain, in exchange for
his equity, two quarter sections of the Colorado land,
situated not far from the quarter he had already pur-
chased, each of which was equally as good land as the
first quarter, and was worth from $35 to $40 an acre.
Plaintiff stated to him that he did not know anything
about the land, but would have to trust to them entirely;
that if they thought it was a good deal for him, and if
they could sell the land, to go ahead and make the trade.
Shortly thereafter defendant took a man to plaintiff's
home upon the Lancaster county farm, representing him
to be the owner of the Colorado land (but who was in fact
an employee of the Buttons), who had come to look the

farm over.  Plaintiff showed him through the buildings and he departed.  This was on Saturday.  On Monday A. L. Button informed plaintiff that he had succeeded in making the trade, and stated that he never had worked so hard in his life to get a deal through.  Button then had a deed of plaintiff's land prepared, running to H. Ross as grantee, who plaintiff supposed was the owner of the Colorado land, but who was in fact a sister-in-law of one of the Buttons.  Up to this time plaintiff had not received a deed from the Buttons to any of the Colorado lands.  The evidence shows that the statements made by Button to plaintiff, when they were out upon the Colorado land, that the owner of the land had been holding the same at $50 an acre, but on account of being hard-up was willing to make a sacrifice and sell it at $40 an acre, were untrue.  Mr. Foster, who was the then owner of that land, testified that he had not been engaged in any speculation, was not hard pressed for money, had neved asked $50 an acre for the land, but, on the contrary, at the very time Button made the representations above set out, he had the quarter section listed with a real estate agent at Colorado Springs at $13.75 an acre, payable $1,000 in cash and a mortgage upon the property for the other $1,200.  After Button had succeeded in making his deal with plaintiff and had obtained from him the $6,400 mortgage, he then sought out Mr. Foster's agent at Colorado Springs and purchased the quarter section of land, which he had sold to plaintiff for $6,400, for $2,400, taking a deed therefor in the name of his sister, H. E. Gibson.  He paid the agent $1,000 in cash and executed a mortgage in the name of H. E. Gibson for $1,200, the other $200 going to the agent as commission.  After making the agreement with plaintiff to trade him the other two quarter sections for his equity in his Lancaster county farm, of the value of $8,100, they obtained from one Albert S. Harper a deed to H. E. Gibson for one quarter, and from one Oliver H. Blank a deed to Gibson for the other

quarter, paying for each quarter $800. Button then, in
the name of H. E. Gibson, executed a deed to plaintiff
for the three quarter sections, subject to the $1,200
mortgage upon the first quarter, in favor of Mr. Foster
from whom they had purchased it. For the $400 com-
mission, which they were to receive from plaintiff for
selling his farm, they obtained plaintiff's note. It will
be seen that the $1,200 mortgage, which they had plain-.
tiff assume, plus the $400 commission note which they
received from him, exactly equalled the amount which
they paid for the two quarter sections of land they had
traded him in exchange for his equity. So that, instead
of receiving a commission of $400 for their services, they.
received the equity in the farm, worth $8,100; and for
the mortgage of $6,400, which they received from plain-
tiff, they paid out $2,400, making their total profit in
the round-up of plaintiff which they had succeeded in
making, $12,100. The evidence shows that neither Drown,
who was named as mortgagee in the $6,400 mortgage, nor
H. E. Gibson, in whose name the title to the Colorado
lands was taken and then conveyed to plaintiff, nor H.
Ross, in whose name the deed to the Lancaster county
farm was taken, had any interest in any of the transac-
tions or knew anything about them, but that in all of these
transactions the Buttons were the real parties interested,
and the three relatives named were mere dummies. The
evidence also shows that the deed from H. E. Gibson to
plaintiff for the Colorado lands was never signed by Mrs
Gibson, but that the name, "H. E. Gibson," was signed
by A. L. Button, who admitted upon cross-examination
that he may have attempted to imitate the handwriting of
H. E. Gibson in making the signature. The deed is ac-
knowledged before one Nellie Sheehy, notary public, who
certified that "H. E. Gibson (Single)" personally ap-
peared before her and acknowledged the execution of the
deed to be "his" voluntary act and deed. Miss Sheehy
was an employee of the Buttons. Mr. Button attempts to
justify his action in signing the deed as was done, by tes-

tifying that he had a power of attorney from his sister, H. E. Gibson, authorizing him to sign her name to deeds and other instruments, and that he supposed that it was all right to sign that way. It is incredible that, after transacting business as a real estate dealer for about 20 years, in seven states and territories, with offices in something like 15 cities in those states, he should be ignorant of the fact that his power of attorney did not give him authority to sign a deed in any such manner. That the whole scheme of using the names of their relatives, and in using the initials of the christian names of the two ladies, was to hide their tracks and enable them to carry out their "peculiar" methods, is apparent. The learned district judge, sitting as a court of equity, and weighing the evidence introduced upon the trial of the case, regarded these transactions as so unconscionable that he set them all aside. We are now asked to reverse the action of the learned district judge upon the ground that the evidence is not sufficient to sustain the judgment. Our answer must be that far less evidence than is shown in the record before us would have been sufficient.

But it is said that plaintiff, by his acts and conduct after discovering the fraud and deception, waived his right to rescind. It is true that, after discovering the deception and fraud which had been practiced upon him, plaintiff, who had been a farmer all his life, did not act with the promptness that would have been shown by men of experience in the business world. He may have been more trustful than a shrewder man would have been, but in a court of equity cupidity is not a good offset against stupidity. We hold that the evidence was sufficient to sustain the decree; that actual fraud on the part of defendants and damage to plaintiff are shown, and that plaintiff's acts, after discovering the fraud, were not, under the circumstances shown, sufficient to constitute a waiver of his right to maintain this suit.

Was the settlement pleaded in defendants' answer proven? We think not. While it is sworn to by one of the

defendants and one of the employees in their office, and by the witness Wilson (who we think was successfully impeached), the circumstances surrounding the transaction and the execution of the so-called settlement agreement, exhibit 3, the inclusion therein of the adjustment of the matters in controversy between defendants and plaintiff's brother, together with the fact that the $400 note, which defendants' witnesses say was produced from defendants' safe and placed upon the table before plaintiff and defendants at the time of the execution of the agreement, was not delivered to plaintiff, but was retained by defendants and found in their possession at the time of the trial, all so strongly corroborate the testimony of plaintiff that the district court was justified in discrediting defendants' witnesses and finding for the plaintiff upon that point.

We do not deem it necessary to refer to or discuss any of the authorities cited. There is no question of law involved in this suit which is not perfectly familiar to every member of the profession. We think counsel for plaintiff is warranted in his contention that, when defendants undertook to represent plaintiff in the sale of his equity in the Lancaster county farm, a fiduciary relation was created between them, and that the rules of law requiring a full disclosure by and the utmost good faith on the part of an agent in dealing with his principal apply; and that, defendants having themselves merged the deal as to the first quarter section into their subsequent dealings with plaintiff as his agent, the whole transaction from start to finish should be treated as one. There is no theory of law or in equity that will warrant our disturbing the righteous judgment entered by the district court.

The judgment is therefore in all things

AFFIRMED.