BUTTON LAND COMPANY, Appellant, v. C. P. NOON, J. G.
    GILROY, and the ATLANTIC NATIONAL BANK, Appellees.

Fraud in the sale of land:  EVIDENCE.  In this action to recover the
1   purchase price of real estate sold upon contract, the evidence is re-
    viewed and held to show that the sale was induced by the fraud and
    misrepresentations of the plaintiff concerning the value and character
    of the land.

Contracts for sale of land:  SPECIFIC PERFORMANCE.  Where time
2   was made of the essence of a contract for the sale of land, the
    vendor, having failed to furnish the deed and abstract within the
    stated time, was not entitled to compel payment of the purchase
    price, even though the time was extended, where it appeared that
    he did not have the title, and tendered no deed or abstract showing
    title until after commencement of suit for the price, and after
    defendants had rescinded their contract.

*Appeal from Cass District Court.*—HON. O. D. WHEELER,
                        Judge.

                TUESDAY, JANUARY 27, 1914.

SUIT in equity to recover the purchase price of certain

real estate, sold by plaintiff to defendants Noon and Gilroy, and to establish a trust upon certain funds in the hands of the defendant bank, left for the purpose of paying part of the purchase price. The defendant bank made no contest; but the other defendants, while admitting the contract to purchase the land, pleaded fraud in the inception thereof and false and fraudulent representations inducing the sale. They also pleaded a counterclaim for money paid to bind the bargain and a cancellation and rescission of the contract. The plaintiff's reply denied the alleged fraud, and alleged other matters to meet issues tendered by the answer, which need not, at this time, be referred to. The trial court, upon the issues joined, found for the defendants, Noon and Gilroy, and rendered judgment against the plaintiff on their counterclaim. Plaintiff appeals.—*Affirmed.*

*Lundy, Wood & Baskerville,* and *T. Whitmore,* for appellant.

*C. A. Robbins* and *C. A. Meredith,* for appellees.

DEEMER, J.—Plaintiff is a copartnership which, at the time material to our inquiry, was located at Lincoln, in the state of Nebraska, and, among other things, was engaged on its own account, and as agents for others, in the handling of lands in the state of Colorado, and particularly in what was known as the San Luis Valley. These were supposed to be either irrigable or irrigated lands, and, to make them of any benefit, water rights had to be secured, and were sold with the lands.

Defendants Noon and Gilroy were one time residents of Cass county, Iowa, who had concluded to go to the town of Sterling, in Colorado, to look for cheaper and more profitable lands than those in their own state, and while

1. FRAUD IN THE SALE OF LAND: evidence.

on their way to the town of Sterling they met one or more of plaintiff's agents, who were then conducting a party to the San Luis Valley, at the

depot in Omaha, and after some talk and persuasion induced
the aforesaid defendants to join the party, and to go with
them to the town of Alamosa, which is in the San Luis Val-
ley. Various representations were made to the defendants
at Omaha regarding the lands, their value, and availability
for use as irrigated lands under a system which they de-
scribed as the subirrigation plan. After arriving at Ala-
mosa, the entire party, of which the said defendants were
thereafter a part, were taken to the town of Monte Vista,
which was in the northwest part of the district, and were
there met by automobiles, and taken into what was known
as the Gun Barrel road district, the most prosperous and best
cultivated part of the entire district, and there shown the
crops which were growing and the produce which had been
raised. They took supper at a little hamlet in this district,
and then returned by auto and train to Alamosa. The next
morning one of the plaintiff partnership made a speech to the
crowd as to what they then intended to do; but the nature
of this address is a matter of sharp dispute. They were told,
as we think the record shows, that they were then to be
taken into a newer and better part of the district, with bet-
ter soil and less rock, than the country they had visited
the day before; that the land was worth $100 per acre; that
a share of water stock, which was adequate, went with each
quarter section of land sold; and that attempts at farming
had been abandoned because of litigation over water rights;
but that these had all been settled, and that there was ample
water now for all. They said that the land was covered with
grease wood and sagebrush, and that, as they had large inter-
ests in this land, they wished to see it settled up. Upon the
conclusion of the address, the party took automobiles and
went out to a little town called Mosca, arriving there about
noon. On the way one of the defendants noticed several
abandoned houses, and, asking the cause thereof, was informed
that it was due to litigation in the courts over water rights,
and that this was then out of the way. As defendants are

Catholics, they said to the agent in charge of their auto that they desired to settle near a school and a Catholic church, and this agent then left the main party, and drove to some lands which were not far from a church, and showed them, among others, the tract for which they finally bargained. They drove along two sides of this land and diagonally across it. This land was covered with grease wood and either sagebrush or what is called chico. They were, it seems, apprehensive that there might be alkali upon the land, but saw nothing which to them was indicative of that fact upon the land itself, although at one or two places during their drive they noticed some deposit, white in color, which they thought might be alkali. Calling the attention of plaintiff's agent to this deposit, they were assured that it was not alkali, but soda, and that there was no alkali in the valley. In order to assure defendants that their water rights would be sufficient, they were taken into a little store at the town of Mosca, and upon questions being asked the proprietor, they were assured that one share of water stock to a quarter section of land would be ample, and that he knew this from his own experience. Liking the looks of a particular quarter section of the land which they had driven over, upon asking the price, they were informed that it was held at $65 per acre, and that this and another quarter immediately south were held by a Denver party, who would sell the entire half section at $60 per acre. The matter was finally referred to one of the partners in the firm, and he sent a man ahead of the party ostensibly to wire the owner, and, as a result, this partner announced to defendants that the owner would take $60 per acre for the half section; that he (plaintiff) would buy it all, and sell the quarter which defendants wanted at the rate of $60 per acre. The deal was then closed, and a contract was entered into, whereby defendants agreed to purchase the land, with one share of water stock, for the sum of $9,600. The defendants wished to pay but $4,000 in cash, and it was arranged that they should have five years' time to pay the remainder.

The following is a copy of the material parts of the contract which was then entered into:

Land Contract—Button Land Company

This agreement made this 18th day of February, A. D. 1910, between Button Land Company, of the first part, and C. P. Noon and J. G. Gilroy, of the second part, witnesseth: That said party of the first part agrees to sell to said party of the second part, and the said party of the second part agrees to purchase of the said party of the first part, on the terms hereinafter mentioned, the following described real estate situated in the county of Costilla, and state of Colorado, to wit (here follows description of lands), together with one share in the Prairie Ditch Company. The said party of the second part agrees to pay to the said party of the first part for the said land the sum of nine thousand six hundred and $0\%_{100}$ dollars in payments as follows: By C. P. Noon $300.00 cash in hand, the receipt of which is hereby acknowledged, $2,100.00 when deed is delivered, and the balance, $2,400.00 in five years from 3—1—10; by J. G. Gilroy $300.00 cash in hand, receipt of which is hereby acknowledged, $1,300.00 when deed is delivered, and the balance $3,200.00 in five years from 3—1—10. No warranty or representation shall be binding or of any force or effect, unless reduced to writing, and made a part of this agreement. The division of the land is to be decided by the second parties. Deferred payments to be on or before. All of said payments to bear interest from date until paid, at the rate of six per cent. per annum, payable annually, principal and interest payable at the office of the Button Land Company, Lincoln, Nebraska. Upon the payment of said principal and interest in accordance with this contract, the party of the first part agrees to make, execute, or cause to be made and executed, and deliver to the party of the second part, his heirs and assigns, a warranty deed from the same, subject, however, to the taxes for A. D. 1910 and subsequent taxes which said party of the second part agrees to pay when the same become due and payable. In case said party of the second part shall refuse or neglect to pay said purchase money or interest as agreed herein, said party shall thereby forfeit any rights he may have to said land, and shall forfeit any money paid in part performance of this contract. Said parties respectfully bind themselves, their heirs, assigns,

and legal representatives, to the faithful performance of the terms of this agreement, and it is agreed that time is the essence of this agreement. But the said party may, at his election, waive a forfeiture of this contract, and proceed to collect the purchase money. In such latter event, default in payment of either interest or principal shall cause the whole amount to become due and payable at the election of the first party. . . . Any assignment of this contract shall not be valid unless consented to in writing hereon by the party of the first part. This contract is, however, made subject to the owner's approval.

In witness whereof, the said parties here hereunto set their hands and the day and year first above written.

> Button Land Co.
>          By A. L. Button, Pres.
> Clarence P. Noon.
> J. G. Gilroy.

On the way home the defendants were each induced to sign the following:

I went to the San Luis Valley, Colorado, with the Button Land Company's party of landseekers and was told by the Button Land Company I must use my own judgment as to the value of land they was offering, the methods of irrigation and water supply, the character of the soil and its adaptability to agriculture. Acting according I examined the soils, looked over the valley carefully, talked with business men and farmers and relying upon my own judgment purchased land from them. I take great pleasure in recommending this land to any one seeking an investment and feel sure that the land will double in value in a very few years. There are also strong indications of oil which I saw and should they get oil in paying quantities, which they are apt to do, this land might be worth from $500 to $1,000 per acre in a short time.

[Signed]                J. G. Gilroy.
                        Clarence P. Noon.

To Whom It may Concern: I take great pleasure in stating that I went to the San Luis Valley, Colorado, with the Button Land Company's party with a view of investing if

this country looked good to me.  I was told by the Button Land Company to investigate the valley, and suit myself, and rely entirely upon my own judgment as to the quality of soil, value of the land they offered for sale, of the adaptability to agriculture, methods of irrigation, water supply, etc.  And, acting accordingly, I looked the valley over carefully, talked with farmers and business men, and concluded this was a great valley, and that an investment would make me money, so I bought eighty acres, and want to recommend it to any one wanting a good home or investment.  It is sure to be a great farming country, and very strong indications of oil that gives one reasons to believe they will get it, and, if that comes, this land could easily be worth $500 per acre in a short time. The Button Land Company has treated me fairly, and I cheerfully recommend them as being and doing all they agree to do in every way.

[In ink:] I have read the above.

[Signed]                                   J. G. Gilroy.

These last exhibits were signed as a *pro forma* matter, and without being read by the defendants.  Defendants Noon and Gilroy returned to their homes in Cass county, and began preparations to move to Colorado.  Shortly after the 1st of March one of plaintiff's agents came to Cass county, and met the defendants, or one of them, and he, or they, inquired about the abstract to the lands.  The agent referred them to the plaintiff at its home office.  On March 12th one of the partners came with an agent to Cass county, and there met the defendants for the purpose of closing the deal.  They had neither abstracts nor deeds, and defendants refused to settle without receiving these papers.  Thereupon they agreed to deposit the amount of the cash payment in the Atlantic National Bank until the abstract was furnished and the title fixed up; the bank issuing the following certificate:

Atlantic, Iowa, March 12, 1910.

This is to certify that there has been deposited in this bank $2,400 to the credit of the Button Land Company of Lincoln, Nebraska, by J. G. Gilroy and C. P. Noon, to be paid

to the Button Land Company when they have delivered the deeds and abstracts showing a perfect title to the northwest quarter of section 7, township 39, range 10, Costilla county, Colorado, the parties to have an opportunity to have the abstract examined, and, when title is shown perfect, the parties to notify the bank at once, and the money then to be paid to the Button Land Company.

After this had been done, A. L. Button, one of the partners, said that he had forgotten to mention that, when the land was sold to defendants, there was a mortgage of $1,500 on each eighty, coming due $300 a year, which could not be paid off then. Noon said that was contrary to the contract, and "you will have to straighten that up." Button replied, "We will see that never bothers you." Button stated that he did not know the land was mortgaged in that way when the contract was made. In fact, the land was incumbered by two trust deeds of $1,500 each, with power of sale without judicial proceedings, to secure the payment of $300 a year and interest for five years to a Mrs. Cheney; and these trust deeds had been executed by a Mr. Day on express instructions from Button, and filed for record on March 9th, only three days before this conversation.

Three days later defendants loaded a car with stock and goods, and proceeded to Alamosa, arriving there on the morning of March 19th. B. G. Button, another of plaintiff firm, gave to Noon an envelope containing an abstract of title and deeds to the land in controversy and notes and mortgages to be executed by the defendants. Before examining the papers, Noon asked B. G. Button whether the mortgages spoken of by his brother at Atlantic had been fixed up. B. G. Button seemed to know nothing about the matter. Then Noon stated what A. L. Button had said at Atlantic, and B. G. Button said that was all right, as they (Buttons) would have to take care of the first mortgage to protect their second mortgage. Noon said that he would not accept it that way, but would have the abstract examined. That day Noon

looked at the abstract, and for the first time learned that the Day trust deed had been put on the land since defendants' agreement to purchase it. The next morning B. G. Button took back the deeds. On March 22d, at Mosca, Noon told B. G. Button that he had not had the abstract examined, but was not satisfied to let the trust deeds stand. On March 24th defendants went to Del Norte, and had the abstract looked over by an attorney there, and, at his suggestion, wrote to the Atlantic bank requesting the return of their money. This letter does not appear in the abstract; but it was followed by another, of which the following is a copy:

Del Norte, Colorado, March 24, 1910.

Mr. Breheny—Dear Friend: We are sending you by this mail papers in regard to our land. But are demanding our money, as we think the company are not living up ·to their agreement. You can see that this mortgage has been recorded since our contract was made, and our contract calls for a perfect title, with nothing but interest to be paid for five years. You can have the papers examined at our expense, and under those conditions we are demanding our money. Do the best you can for us, and send the money in draft to Mosca, Colorado. [Signed] C. P. Noon. J. G. Gilroy.

P. S. Return all papers to us at Mosca.

During the latter part of March of the year 1910 defendants for the first time discovered evidences of alkali in and upon the land, and then began making inquiries of settlers regarding the same, and were informed, so it is claimed, that the land was full of alkali, that there was insufficient water to irrigate the same, and that the so-called system of sub-irrigation was a failure. They also learned, so it is claimed, that the previous litigation had nothing to do with the water shortage, but that this shortage was inherent in the plans, that one water share was wholly insufficient to supply the land with water, and that most of the land in the district had been abandoned, because it had become "sour," and for the reason that it was full of alkali, and without expensive

drainage could not be made to produce satisfactory crops. One of the members of the plaintiff firm appeared upon the scene the latter part of March, or the 1st of April, and defendants informed him that they had stopped the payment of the money by the Atlantic Bank; that they would not take the lands, but would leave them, and go to some other part of the state. This member of the firm threatened a lawsuit; but the defendants did leave the property, and they have never accepted the same.

Some time in June of the year 1910 one of the plaintiff's firm met the defendants and stated he was ready to settle; but he proffered no abstract, and tendered no deed. He did, however, offer a share of water stock which was then in the name of E. C. Hammond. Defendants placed their matter in the hands of Denver attorneys, and it is claimed that plaintiff had some conversation or negotiations with them which we do not regard as important.

Failing to reach an agreement, plaintiff commenced this action to recover the purchase price, etc., in the district court of Cass county, Iowa, on July 23, 1910; but it was tried on an amended petition, filed November 21, 1911. As a matter of fact, at the time the contract was signed for the land in controversy a Mrs. Alice B. Cheney, who lived at Monte Vista, Colo., was the owner of the land, and she had no interest in the adjoining quarter section. She had not listed the land with plaintiff for sale at that time, and she never received any telegram from plaintiff or any of its agents regarding the land or its selling value. She subsequently sold the quarter, with two shares of water stock, to one of the plaintiffs or their agents for $4,500, and this was doubtless more than it was worth. This deed for the land was made on the 8th day of March, filed for record on the 9th, and certified by the abstractor on the 12th of March, 1910, and, as a part of the consideration, trust deeds amounting to $3,000 were executed to Mrs. Cheney, payable at the rate of $300 per year for a term of years. The deed from Mrs. Cheney

ran to one Day, and Day made no deed until June 15, 1910. On examining the abstract, which disclosed the trust deeds, Noon objected thereto, and one of plaintiffs undertook to see that these were released; but this was not done until a much later date, and no abstract was ever tendered defendants showing the satisfaction thereof. The abstract was not offered upon the trial of this case, and it does not appear that any sufficient abstract was tendered the defendants even at the trial.

This is a broad outline of the case, and, upon the issues joined, and the testimony adduced in support thereof, the trial court made the following finding of facts:

That the equities are with the defendants, and that the contract in suit herein is not such a contract as the court, in good conscience, ought to require to be performed. That the contract in suit was procured by false and fraudulent misstatements of fact. That the plaintiff company, and the members and agents thereof, falsely and fraudulently represented to said defendants that the owners of said land held the same at $65 per acre, when in truth and in fact the agent of said company had an option on said land for the price of '$4,500. That they represented that said company had no interest in said land except a commission for the sale, when in fact they controlled such option. That they represented that said land was new and unsettled on account of litigation over water rights, when in truth it had been previously settled and abandoned because of the fact that the land had been soured, and was impregnated with alkali. That they represented that one share of water stock in the Prairie Ditch would be sufficient to furnish water for the irrigation of such tract, when in truth and in fact it is not sufficient. That all of the above and foregoing representations were false, and were known to be false by said members and agents of said company, and they were made for the purpose of inducing the defendants to purchase said lands, and defendants were thereby induced to make such purchase. That the defendants, on learning of such fraud, rescinded said contract. That said lands are of very little value, unless the same can be drained, and the alkali thus disposed of.

These findings have support in the testimony, and, although the evidence is in some conflict regarding some of the propositions, enough of them are established by practically the undisputed record to justify the relief granted by the court below. Moreover, some of the other defenses not mentioned in these findings are established by the evidence, and on the whole record we are abundantly satisfied that the decree should be sustained. The contract itself is peculiar, and bears evidence on its face of an effort to escape the results of fraud and misrepresentation. And the statements which the plaintiff secured from the defendants after they entered into the agreement as a result of misrepresentations made to them, and before they had discovered the fraud, are not such as would likely be used to influence others to purchase from the plaintiff, but evidently to fortify themselves in the event their fraud was discovered. The entire proceedings bear many of the earmarks of fraud, and the history of the transaction is simply a reiteration of practices recently adopted by unscrupulous land agents to fleece the farmers of the middle west who became possessed of a not unnatural land hunger, and the dupes of the glib-tongued real estate broker who painted vivid pictures of the future of an almost barren country.

The case reads very much like *Tiger v. Button Land Co.*, 91 Neb. 63 (135 N. W. 368, 41 L. R. A. (N. S.) 805), Ann. Cas. 1913-D, 97, where the Nebraska court reached the same result. See, also. *Latta v. Button Land Co.*, 91 Neb. 689 (136 N. W. 1013.)

If for no other reason we would be inclined to affirm this case on the theory that plaintiff never complied with its contract. Time was the essence thereof, and it was to be performed by plaintiff on the 1st day of March, 1910. Plaintiff was in no position to fulfill at that time; it had no title to the land, and no abstract showing title. Assuming that it secured an extension to perfect title and secure an abstract, it did not

2. CONTRACTS FOR THE SALE OF LAND: specific performance.

tender either to the defendants until after defendants had rescinded their contract, and demanded back their money from the Atlantic Bank. Indeed, it does not appear that it ever before the commencement of this suit tendered an abstract showing title to the lands in it or in any one representing it. They offered such abstract in the petition filed in the case; but this is not in the record, and we do not know what it contains.

Under familiar principles, plaintiff was not entitled to demand its money on the showing made. *Lessinch v. Sellers*, 119 Iowa, 314; *Brown v. Widen* (Iowa), 103 N. W. Rep. 158; *Spooner v. Cross*, 127 Iowa, 259; *Severson v. Kock*, 159 Iowa, 343.

The decree seems to be correct, and it is *Affirmed*.

LADD, C. J., and WITHROW and GAYNOR, JJ., concur.